## GREEN v. GREEN.

1. APPEAL.—Errors of Circuit Judge in stating amount of judgments, and in ascribing contention to counsel, corrected on appeal.

2. TRUSTEE—REMAINDERMEN—INSURANCE MONEY.—A LIFE TENANT is an implied or quasi trustee for remaindermen, and insurance money arising from total loss of entailed property insured by life tenant, if not used in rebuilding, is impressed with same trust as buildings—*following Clyburn* v. *Reynolds,* 31 S. C., 118.

3. TRUSTEES.—EQUITY does not deal so strictly in accounting with implied as with express trustees. *Mr. Chief Justice McIver, dissenting.*

4. LIFE TENANT—REMAINDERMEN—INSURANCE MONEY—RESULTING TRUST.—Where life tenant uses insurance money paid to her for total loss of entailed house in purchasing a junior lien on another piece of property, and afterwards she buy such property at foreclosure sale with her own funds, the remaindermen have the right to consider the money paid for the junior lien as invested in the property; and such transaction makes a resulting trust. *Mr. Chief Justice McIver dissents as to latter proposition, holding it to be a constructive trust.*

13—56

5. TRUSTEE—LIFE TENANT—REMAINDERMEN.—When a life tenant without intent of fraud, and ignorant of the trust character of a fund, invests it along with his own funds, the remaindermen can only obtain a lien on the property so bought to secure the repayment of the trust fund. *Mr. Chief Justice McIver dissents.*

6. MINORS.—Where minors are interested, it is error to dismiss complaint because plaintiff did not accept offer of judgment by defendant.

7. CASE CORRECTED.—Mr. Chief Justice McIver in dissenting opinion corrects errors in *Rogers* v. *Rogers*, 52 S. C., 392.

8. CASES DISTINGUISHED.—Mr. Chief Justice McIver in dissenting opinion *distinguishes Myers* v. *Myers*, 2 McC. Ch., 214; *Wallace* v. *McCollough*, 1 Rich. Eq., 426, and *Mathews* v. *Heyward*, 2 S. C., 239, *from this case.*

9. Mr. Chief Justice McIver in dissenting opinion considers additional grounds of respondents not considered in opinion of Court, and concludes:

a. STATUTE OF LIMITATIONS does not commence to run against remaindermen until falling in of life estate, or until life tenant does some act which imperils rights of remaindermen.

b. LACHES cannot apply when statute of limitations does not bar.

c. ESTOPPEL.—The fact that remaindermen knew of investment by life tenant for more than statutory period and did not object, cannot act as estoppel except where they seek to make life tenant responsible for such investment.

Before GARY, J., Richland, February, 1899.    Modified.

Action by Frederick L. Green, as administrator of the estate of Allen J. Green, deceased, and as administrator of the estate of Frederick L. Green, deceased, and also in his own right, William G. Green, G. Washington Pringle, Allen C. Green, Walter G. Green, Sally S. Green, Allen J. Green, of Alabama, Walter Green, and Martha C. Green, appellants, against Lucy J. Green, Halcott P. Green, as trustee, Sally G. Heyward, Lucy P. Heyward, Nathaniel B. Heyward, Halcott P. Green, as administrator of the estate of Halcott P. Green, deceased, and also as administrator of the estate of John S. Green, deceased, and also in his own right, Allen J. Green, of South Carolina, Eliza G. Singleton, M. Caroline Jervey, Walter Izard, Henry Izard, Allen Izard,

and Izard Heyward, respondents, and Frederick G. DeSaussure, appellant.

The master's report fully states the facts.

The above stated case was referred to me by an order of Hon. O. W. Buchanan, presiding Judge of this Court, dated November 12th, 1896, "to take the testimony upon all the issues in the cause and report the same, together with my findings of fact therein, to this Court." On May 26th, 1898, I held a reference under said order, attended by the attorneys of record in said cause. , Mr. Jervey, on part of the defendant, Lucy J. Green, and the other defendants who adopt her answer, moved to amend their answers, as set out in a paper received and designated therein as "a notice of a motion for amendment." I granted this motion, and allowed the amendment proposed in said paper which I herewith report, with the endorsement thereon. The defendant, Lucy J. Green, made offer of judgment in writing, which was filed with me as master as a part of the record in this case, which was accepted by all parties as a proper offer under the Code. Subsequently to said date, I held several other references, attended by the attorneys of record, took all the testimony offered on all the issues in said cause, which I herewith report, marked "Y," together with my findings of fact thereon.

1. All the parties named in the summons have been duly served, and all of them have appeared and answered. The infant defendants were all properly represented by guardians *ad litem* duly appointed. The guardian *ad litem* appointed for the infant defendant, Frederick G. DeSaussure, having died, another guardian *ad litem* was appointed for that purpose.

2. Mrs. Lucy P. Green departed this life on or about the 6th day of April, 1864, leaving a last will and testament, whereby she devised her residence, a house and lot in the city of Columbia, situate at the corner of Bull and Senate streets, containing one and a half acres, to "my daughter, Lucy J. Green, * * * together with all the furniture and things

appurtenant in the house and kitchen. * * * This devise is
made to her for life, for her sole and separate use, not sub-
ject to the debts, contracts or control of any husband with
whom she may intermarry.  At her death I devise and be-
queath the same to my four sons, Allen J. Green, Halcott P.
Green, Frederick L. Green and John S. Green, and the chil-
dren of my daughter Lucy, if she should have any living at
her death, they taking among them one share; if she leaves
none living at her death, then to my four sons."

3. At her death the four sons and her daughter, Lucy,
were all living.  Since that time, of the sons, John has died
intestate, unmarried and without issue.  Allen J. Green has
died intestate, leaving surviving him his widow, Sally S.
Green, and his children, Allen J. Green, Walter Green, and
Martha C. Green, plaintiffs, who reside in Alabama.  Halcott
P. Green has died intestate, and leaving surviving him his
children, Allen J. Green, Sally C. Heyward, Eliza G. Single-
ton, Mary Caroline Jervey, and Halcott P. Green, who re-
side in South Carolina.  And Frederick L. Green has died
intestate, leaving surviving him his children, Frederick L.
Green, William G. Green, G. Washington Pringle, Allen G.
Green, Walter G. Green, and Frederick G. DeSaussure, a
minor grand-son, child of deceased daughter, Lucy D. De-
Saussure, who reside in South Carolina.  Letters of admin-
istration have been duly issued as follows: On estate of
Allen J. Green, to Frederick L. Green; on estate of Freder-
ick L. Green, to Frederick L. Green; on estate of Halcott P.
Green, to Halcott P. Green, and on estate of John S. Green,
to Halcott P. Green.  Miss Lucy Green survives and has
never been married, and soon after the decease of the testa-
trix, she went into possession of the devise and bequest.

4. In November, 1877, the dwelling devised was de-
stroyed by fire, and no dwelling house or other structure has
been rebuilded on the said lot.  There was a policy of insur-
ance on same, which was paid to Miss Lucy J. Green, the life
tenant, by the insurance company, in the sum of $3,000.
This payment was made about one month after the fire.

She invested the said amount in a call loan to the Charlotte, Columbia and Augusta Railroad Company, with security at ten per cent., interest payable monthly. Her four brothers (who with her children, should she have any, are the remaindermen), had full knowledge of the payment to her of the insurance, and the loan of it to Allen J. Green, committee of John S. Green, hereinafter referred to.

5. I further find that in the meantime one of the brothers, remainderman, John S. Green, was some time in the summer of 1877 declared a lunatic, and that the defendant, Allen J. Green, of South Carolina, was duly appointed his committee. That on taking charge of the estate of John S. Green, he found it very much embarrassed. This estate consisted of the property described in the complaint as the brick yard, containing 418 acres, more or less, and one lot in the city of Columbia, situate at the corner of Bull and Pendleton streets, containing one acre, more or less, and certain inconsiderable personal property. That the debts due by the estate of John S. Green aggregated something over $7,000.

6. That on taking charge of said estate, the said Allen J. Green, committee, petitioned the Court of Probate of Richland County, and obtained an order authorizing him to sell such of the personal property as he found it necessary to sell, and to borrow on the real estate such sum as he might find necessary to relieve the estate of its embarrassments. Efforts in this direction were made by said committee unsuccessfully, until in January, 1878, when he applied to the defendant, Lucy J. Green.

7. That upon said application the said Miss Lucy J. Green lent to the said Allen J. Green, the committee of John S. Green, lunatic, the sum of $3,200—$3,000 of which was the said insurance money, paid to Allen J. Green upon Miss Green's order by Col. Palmer, president of the C. & A. R. R. Co., the remainder, $200, her own funds derived from other sources.

8. That the said Allen J. Green, committee of the said John S. Green, paid out the said insurance money so bor-

rowed as follows: First to Miss Lucy J. Green, $300, the interest in advance at ten per cent. per annum on said $3,000, and $2,200 to Bachman & Youmans, attorneys for Mazyck and Henneman, who held the first lien on the brick yard tract, under a decree of foreclosure in the case of John A. Henneman vs. Allen J. Green, as committee of John S. Green, lunatic, and others; and next the sum of $500 to N. Barnwell, representing John T. Rhett, attorney for E. J. Scott & Sons and R. J. Brownfield, on judgments which they held against said John S. Green.

9. That the said sum of $3,200 was secured to the said Lucy J. Green by two notes of said Allen J. Green, committee, one for $2,700, dated the 14th day of March, 1879, and by the assignment to her of their interest by Henneman and Mazyck in the said decree, to the extent of $2,200, the amount paid them as aforesaid, and also by the assignment to her of the said Scott and Brownfield judgment in full by the owners thereof. The remaining sum of $500 was secured to Miss Lucy J. Green by the note of said Allen J. Green, committee of John S. Green, dated March 14th, 1878, payable one day after date, with interest from date payable annually, and a mortgage on the Pendleton street lot, property of said John S. Green. The said amount of said decree of foreclosure was assigned by Henneman and Mazyck to Miss Green, with the express provision that the remaining portion of said decree still due should be a first lien on the mortgaged property, and that Miss Lucy Green's interest therein should be junior to said interest of said Henneman and Mazyck, and costs.

10. This loan of money derived from the insurance company the brothers of Miss Green had full knowledge of, and made no objection thereto.

11. I further find that Allen J. Green, committee of John S. Green, having failed, in the fall of 1878, to borrow more money on the security of real estate of John S. Green, to pay the pressing claims against the estate of his lunatic, Messrs. Bachman & Youmans, representing the decree of foreclos-

ure of the mortgages of Mazyck and Henneman, which constituted senior liens upon the brick yard, advertised the same for sale on January 6, 1879.

12. That on that day, upon a fair and open sale, the property was knocked down to and sold and conveyed to Miss Lucy J. Green in fee for $2,500. She was represented at the sale by her brother, Mr. Halcott P. Green. Mr. Allen J. Green in no way represented her interests. The purchaser, Miss Green, complied with the terms of sale and received a deed of conveyance. She paid $2,500 cash, which was disbursed as follows:

To costs of attorney, clerk and referee.. .. .. .. .. $118 25
To costs of sheriff.. .. .. .. .. .. .. .. .. .. .. ..      48 90
To Bachman & Youmans, in full of amount due
    them under the decree.. .. .. .. .. .. .. .. .. 2,305 59
To Miss Lucy J. Green, balance from purchase..      27 26
                                                                                                     ─────────
                                                                                                     $2,500 00

Miss Green receipted for the $27.26, but I also find that in addition she paid $176.66 taxes on the brick yard tract, which under decree was ordered first paid. The $2,500 with which Miss Green paid the purchase money was raised as follows: She borrowed of Miss Grace Elmore $2,000, which was secured by a first mortgage on the purchased premises, and she discounted in bank her note for $600, on which Mr. Stanley was indorser, he being secured by a mortgage on brick yard. This Stanley note was paid at maturity by Miss Green with her own funds derived from Rock Hill investments, which was in no way connected with the insurance; and the $2,000 bond was paid to Miss Elmore out of the proceeds of the sale of the brick yard by Miss Lucy J. Green in 1891. From the date of this sale (January 6, 1879), until April 22, 1891, Miss Green remained in possession of the brick yard, which yielded her an income averaging her about $900 gross per annum. In 1891, the property was sold for $10,000 cash and $30,000 in bonds, which are yet outstanding. The $10,000 was expended in

paying the Elmore bond of $2,000 and in erecting two houses, one on a portion of the city lot at the corner of Bull and Pendleton streets, which is now occupied by Miss Lucy J. Green, and the other on the lot described in the pleadings as having been conveyed to Halcott P. Green, as trustee, by Miss Green. The $30,000 credit purchase money is still held by Miss Green.

13. That at the time of the said assignment, to wit: the 14th March, 1878, and December 14th, 1878, by. Henneman and Mazyck to Miss Green, the said brick yard tract described in the complaint was considered worth double the whole amount due on said decree, and was assessed on the tax books for $14,340; at the time of the said sale and conveyance of the brick yard tract to Miss Green, the said tract was assessed on the tax books at $12,040, and the two next succeeding years at $10,500. The taxes for the fiscal years 1877-79 were $105.35; 1879-80, $107.88, and for 1880 and 1881, they were $126. The evidence does not show the taxable value for any other year.

14. That in March, 1878, and thereafter until the sale of the Pendleton street lot, referred to below, the following judgments were outstanding against John S. Green, having lien on his real estate in the order of their priority as indicated by their dates, to wit: No. 2680, John Agnew, 7th February, 1877, $67.50; No. 2702, E. J. Scott & Sons, 12th February, 1877, $240.07; No. 2715, John Agnew, 12th February, 1877, $1,084.72; No. 2834, Union Bank, 31st May, 1877, $153.74; No. 2961, R. J. Brownfield, 27th November, $297.67.

15. That on salesday in February, 1880, a sale of the personal property of John S. Green and the lot at the corner of Bull and Pendleton streets, mortgaged as aforesaid to Miss Lucy J. Green, was made under a levy by the sheriff of Richland County under the said Agnew and Scott judgments. The personal property at such sale was sold for $291.80, and said lot for $590. Miss Green bid in the said lot, and took the sheriff's title thereto for that price, and

also purchased of the personalty so sold of the value of $182.50. She complied with the terms of the said sale, and the proceeds thereof were distributed as follows: 1st. Costs and expenses, $55.93. 2d. Agnew judgment, interest and costs, $84.40. 3d. Scott judgment and costs, $294.86. 4th. Agnew judgment and costs, $447.16. Of the proceeds of this sale, I find that Miss Green received $289.86 on account of her loan to Allen J. Green, committee, same being credit on judgment of Scott, assigned to her as collateral security to the said note of Allen J. Green, committee. Later, on April 5th, 1880, the other lot in Green street was sold under the same levy, and the proceeds paid on the second Agnew and Union Bank judgments, which do not concern this issue. The assessed value of the Pendleton street lot at the time of the sale thereof in 1880 and for the year 1881 was $1,000.

My conclusions of fact, therefore, are: That Miss Lucy J. Green loaned Allen J. Green, as committee of John S. Green, the sum of $3,200, of which sum $3,000 was the said insurance money; that on the said loan she has only received the sum of $289.86, by a credit on the Scott judgment which was assigned as a part of the collateral, and the sum of $27.26, the same being a credit on the Mazyck and Henneman decree, and has paid from her own funds the sum of $482.64 on the purchase of the Bull street lot, and the sum of $2,531.15, the whole of the purchase of the brick yard tract, which latter amount includes the taxes, which were to be first paid under the decree.

From Circuit decree all plaintiffs and one defendant appeal.

*Mr. R. W. Shand,* for appellants, cites: *Trust funds retain their trust character into whatever property they are traced:* Rich. Eq. Ca., 176; 25 S. C., 39; 4 DeSaus., 153; 23 S. C., 513; 3 How., 401; 143 N. Y., 544; 38 N. E. R., 715; 48 N. E. R., 790. *It is against the policy of the law to permit a*

*trustee· to purchase in his own name and for his own use trust property coverred by a lien held by him in trust, except when he has individual interests to protect:* 2 McC. Ch., 265; 1 Hill Ch., 354; 4 Rich. Eq., 165; 7 S. C., 185; 31 S. C., 183. *Any advantage gained by the trustee, or any benefit accruing to him by reason of his office or use of trust funds, enures to the advantage and benefit of the cestui que trust:* Rich. Eq. Ca., 174; 4 Mon., 297; 24 Pick., 96; 13 S. E. R., 53; 26 S. C., 370. *Questions raised by additional grounds of respondent should be reserved for reply:* 15 S. C., 103. *As to application of statute of limitations:* 2 Wend., 366; 17 S. E. R., 209; 25 S. W. R., 834; 1 Hill. Ch., 69; 2 Rich. Eq.; 259; 26 S. E. R., 17; 17 S. C., 45. *As to laches:* 54 Am. Dec., 130; 6 S. C., 105; 3 How., 411; 15 S. C., 362; 25 S. C., 40; 35 S. C., 430.

*Messrs. Smythe, Lee & Frost,* also for appellants, by Mr. Lee, cite: *As additional authorities to support the first proposition advanced by Mr. Shand:* 1 McC. Ch., 383; 2 McC. Ch., 214; 1 Strob. Eq., 103; 6 S. C., 159; 25 S. C., 35; 3 Binney, 302; 17 S. C., 45; 11 Smed. & M., 78.

*Messrs. Green & Green* and *W. St. Julien Jervey,* contra, cite: *Are findings of fact by the master unexcepted to subject to review by this Court:* 45 S. C., 262; 14 S. C., 312; 17 S. C., 260; 45 S. C., 503; 47 S. C., 347. *To what class of trustees shall the defendant be referred, and what are the laws regulating such trusts:* 12 S. C., 450; 52 S. C., 392. *What is necessary to be shown in order to create a resulting trust in property purchased by trustee in his own name?* 19 S. C., 135; 2 S. C., 245; 52 S. C., 479; 46 S. C., 193. *Kind of proof necessary:* 52 S. C., 391; 51 S. C., 38. *The right of a cestui que trust in trust property purchased by an implied trustee with trust funds, and title taken in his own name, consists only in a lien on such property to the extent of the trust funds so invested, and does not extend to a right to the property itself:* 2 Serg. & Raw., 521; 2 S. C., 25; 52 S. C.,

479; 1 Rich. Eq., 427; 19 Ala., 805; 2 McC. Ch., 264. *The principle that the cestui que trust may elect whether he will seek indemnity for the fund or follow the property, has no application to this case. The following cases do not apply to trusts of this kind:* 1 McC. Ch., 383; 1 Strob. Eq., 103; 6 S. C., 159; 24 S. C., 179; 25 S. C., 35; 26 S. C., 370; 3 Binney, 302; 3 How., 401; 4 DeSaus., 153; 48 N. E. R., 790; 23 S. C., 513; 13 S. E. R., 53. *This action is barred by statute of limitations:* 1 Hill Ch., 65; 34 S. C., 266; 15 S. C., 164; 2 Rich. Eq., 259; 1 McM., 333; 9 S. C., 488; 19 S. C., 238; 15 S. C., 170. *By laches and acquiescence the remaindermen and the plaintiffs have put themselves in a position in which equity will afford them no relief:* 2 S. C., 246; 15 S. C., 164; 6 S. C., 105; 2 Rich. Eq., 259; 1 Hill Ch., 69. *If the arrangement that Miss Green should have and use the money to assist her brother, was a family settlement, this Court will not now break up the arrangement:* 32 S. C., 263; 19 S. C., 591; 9 Rich. Eq., 498.

November 8, 1899. The opinion of the Court was delivered by

MR. JUSTICE POPE. This is the second time this action has been in this Court, involving, as it does, the disposition of questions arising from the receipt by a life tenant of $3,000, under a policy of insurance against destruction by fire of a dwelling house. The first appeal was disposed of in *50 S. C., 514.* All that is now necessary to do, in referring to the first appeal, is to state that under it were disposed of: *First,* the demurrer of defendants to plaintiffs' complaint on the ground that it did not state facts sufficient to constitute a cause of action, which demurrer was overruled. *Second,* the demurrer of plaintiffs to so much of the defendants' answer as set up the defense that because the defendant, Lucy J. Green, had paid out of her own funds the insurance premium required to obtain the policy of insurance, taken in her own name, against loss by fire of the dwelling house in which, under the will of Lucy P. Green, she, Miss Lucy J.

Green, had a life estate, she was entitled to hold the $3,000 as the proceeds of the policy of insurance when the said dwelling house was burned, as of her own estate in fee simple, freed from any and all right therein on the part of the remaindermen named in the will of said Mrs. Lucy P. Green, deceased, and their respective heirs at law. This demurrer of plaintiffs was sustained. And *third,* by the defendants, that the Circuit Judge who heard the cause, so far as preceding demurrers were concerned, Judge Buchanan, had no right to refer the issues of fact to be reported upon by the master of Richland County. This was also overruled. The other grounds of appeal do not need a recital thereof just here. After the action was remitted to the Circuit Court of Richland, and when it came before John S. Verner, Esq., as master for Richland County, three things happened, that must be stated. *First,* Mrs. M. Caroline Jervey, who was a defendant, departed this life on the 16th of September, 1898, and by due process her heirs at law, consisting of her husband, the Hon. W. St. Julien Jervey, and his two infant children, Amaryllis Jervey and Allen J. Jervey, were substituted as defendants in her stead, and they adopted her answer as their own. *Next,* the defendant, Miss Lucy J. Green, offered to allow judgment to be taken in this cause to the effect that the $3,000 insurance money is held by her in trust for herself for life, with remainder as provided in the first clause of the will of Mrs. Lucy P. Green, and requiring her to furnish such security for the safety of the fund as the Court might direct, and for the costs of the action. *Lastly,* an amendment was offered, and allowed, to the answer of defendants, by which it was alleged that the plaintiffs are not entitled to the relief prayed for: "1. Because the investment of the insurance money alleged in the complaint, and all the facts and circumstances connected therewith, were well known to and acquiesced in by the ancestors of plaintiffs, the remaindermen, under the will of Lucy P. Green, prior to their death, and more than sixteen years prior to the commencement of this action; and that by

the acquiescence of the said remaindermen and by the plain-
tiffs, the said remaindermen and plaintiffs have waived the
alleged breach of trust, if any, and plaintiffs are now es-
topped and barred from asserting the same.   2. Because the
alleged cause of action of the said plaintiffs accrued more
than ten years before the commencement of this action, and
the said action is barred by lapse of time and laches of the
plaintiffs and their ancestors from whom they claim." · At
the references before the master both sides to the contro-
versy introduced testimony both oral and written. On the
16th September, 1898, the master submitted his report con-
taining his findings of fact, to which report neither side
made any exception.   So it stands as approved.   Such re-
port should be set out in full in the report of this cause, for
the facts as there stated will be relied upon by us for a state-
ment thereof, so as to avoid making this opinion too long.
The cause then came on to be heard before the Honorable
Ernest Gary, as Judge of the Fifth Circuit.   By his decree,
among other things, he maintained that the testimony failed
to show that any of the insurance money in the hands of
Miss Lucy J. Green was applied by her to the purchase of the
brick yard tract, 417 acres of land (which Miss Green had
sold for $10,000 in cash and $30,000 on a credit secured by
bonds of the purchaser, nor to the purchase of the lot of land
on Bull street) ; that the offer of Miss Green to allow judg-
ment in this action for $3,000 is all the relief the plaintiffs
are entitled to; and having reached this conclusion, he de-
clined to consider the other defenses, but ordered the com-
plaint dismissed, reserving to the plaintiffs a reasonable time
to accept offer of judgment by Miss Lucy J. Green.   From
this decree of Judge Ernest Gary, the plaintiffs and the
infant defendant, F. G. DeSaussure, by John Kershaw, his
guardian *ad litem,* have appealed, alleging error: "1. In
finding that the Scott and Brownfield judgments included
one for $1,084.72, and in not holding that the money paid to
N. Barnwell was applied as follows: $240.07 to the Scott
judgment, and $297.67 to the Brownfield judgment.   2. In

stating that 'counsel for plaintiffs contend in the argument, that inasmuch as Miss Green, by her purchase with the insurance money of an interest in the decree of foreclosure (under which the brick yard was sold), placed herself in such a position that she could not bid up to the full amount of the decree of foreclosure;' whereas the contention of plaintiffs was that by her control of the third lien Miss Green was enabled to acquire the property at a price far below its real value. 3. In holding that Miss Green's offer of judgment gives to the plaintiffs all the relief to which they are entitled, and is in strict compliance with the decision of the Supreme Court rendered in this case. 4. In holding that the plaintiffs have failed to show that this fund was invested in the brick yard. 5. In holding that 'Having a right to lend the fund, she (Miss Green) can only be held accountable for the original amount.' 6. In ordering 'that the complaint of the plaintiff be dismissed.' 7. In not holding that the dwelling house on the devised lot of land was clearly traced through successive changes into a policy of insurance, and on down into the Pendleton street lot, with the improvements thereon, and a bond for $30,000, secured by a mortgage of the brick yard tract. 8. In not holding that the corpus of the trust fund, consisting of $3,000 in 1877, had simply grown up into a fund worth about $40,000, through an increase in the valuation of property. 9. In not holding that the lien which Miss Green acquired on the brick yard tract and Pendleton street lot, enured to the benefit of the remaindermen; and that if by reason of her control of such liens she was thereafter enabled to acquire such property, she held such property subject to the same trusts as attached to the liens before her purchase. 10. In not holding that Miss Green, as trustee, having a lien on property which was sold under such lien, could not purchase such property for her own use to the exclusion of the remaindermen, even by reimbursing them, if they elect to follow the property. 11. In not holding that the brick yard tract and the Pendleton street lot were worth more than the amount bid for them

when sold, plus the trust money which she had previously lent on their security. 12. In not holding that Miss Green held the Pendleton street lot and the bond for $30,000 secured by mortgage of the brick yard tract, only for her life, with the remainders over under the terms of the first item of her mother's will. 13. In not holding that H. P. Green holds the Heyward house and lot as trustee for Mrs. Heyward and her children, for the life of Miss Lucy J. Green, with a remainder over under the first item of the will of Mrs. Lucy P. Green. 14. In not holding that the life tenant having acquired the brick yard tract and Pendleton street lot by the use and employment of the trust fund, the remaindermen have the right to elect to treat the said property as a part of the trust estate; because a trustee cannot make any advantage to himself of the trust fund, nor employ the trust fund for his own benefit."

According to the approved course, the defendants submitted the following additional grounds in support of the Circuit decree:

"1. Because the payment of the insurance money to the life tenant and its investment by her in the loan to the Charlotte, Columbia and Augusta Railroad Company, and all the facts and circumstances connected therewith, as well as the claim of the life tenant to the fund as her individual property, being at the time and more than eighteen years prior to the commencement of this action well known to and acquiesced in by the ancestors of plaintiffs, remaindermen under the will of Mrs. Lucy P. Green: (a) The said remaindermen and the plaintiffs are by lapse of time and the statute of limitations now barred from establishing a trust therein. (b) The said remaindermen and the plaintiffs have waived (and lost any) right to assert or claim a trust therein by their laches, and are barred and estopped from establishing the same.

"2. That the repayment of the insurance fund to the life tenant and its reinvestment by her in the loan to Allen J. Green, as committee of John S. Green, in 1878, upon the

securities taken therefor (being a breach of trust), as well as the disavowal by the life tenant of any trust relation to the fund, and all the facts and circumstances connected therewith, being at the time and more than eighteen years prior to the commencement of this action by the life tenant, fully disclosed and well known to the ancestors of plaintiffs, remaindermen under the will of Mrs. Green. (a) The said remaindermen and the plaintiffs are by lapse of time and the statute of limitations now barred from establishing a trust in such securities or the money collected therefrom. (b) By the acquiescence of said remaindermen and plaintiffs in such investment, plaintiffs are now estopped and barred from holding the life tenant liable to any greater amount than the amount of money repaid her upon such securities, to wit: $289.85.

"3. That the purchase of the brick yard tract in 1879 and of the Pendleton street lot in 1880, by the life tenant, as well as her claim to the same as her own absolute, individual property, and all the facts and circumstances connected therewith, having been at the time fully disclosed to the ancestors of plaintiffs, more than seventeen and sixteen years, respectively, prior to the commencement of this action, the plaintiffs are by lapse of time and the statute of limitations now barred from establishing a trust in such lands or the proceeds of a sale thereof.

"4. That all the facts and circumstances in relation to the use of the insurance fund by Miss Green to disembarrass the estate of John S. Green, her brother, and one of the remaindermen under the will of Mrs. Green, as disclosed by the testimony, show that there was a common consent by the other remaindermen, then all *in esse,* that Miss Green should have the absolute disposition and control of the insurance fund, with the declared intention of devoting the same to the comfort and support of the said John S. Green, and that the same was so used, and the Court will now uphold that arrangement as a family settlement, and will not, eighteen years thereafter and after the death of all of the remainder-

men, permit the same to be violated or set aside by the plaintiffs, who are only heirs at law of the assenting remainder-men."

If it had been necessary to look for support to the Circuit decree outside of its own reasoning, the suggestions embodied in the "additional grounds" of the defendants are freighted with interesting questions, but, in reaching our conclusion, we have been able to do so on the lines marked out by the Circuit Judge.

The two first exceptions are sustained. By inadvertence, no doubt, the Circuit Judge referred to the Scott and Brownfield judgments as including one for $1,094.72, when such was not the fact. Nor was the Circuit Judge correct in ascribing the contention to the counsel for plaintiffs, as set out in the second ground of appeal.

To avoid the appearance of dealing with the remaining grounds of appeal in a disjointed manner, we will give them our attention in our way. Unquestionably, the former decision of this Court in sustaining the demurrer of the plaintiffs to so much of the answer of Miss Lucy J. Green as set up a freedom from any liability to the plaintiffs for the amount of the insurance money received by her as the result of the accidental destruction of the dwelling house by fire in the year 1877, because, she said, she had taken out the insurance in her own name and paid the premium for such insurance with her own money, destroyed that defense, for we distinctly announced that we upheld the doctrine announced in *Clyburn* v. *Reynolds,* 31 S. C., where it was said: "We, therefore, think that a sound public policy requires that any money collected by a life tenant on a total loss by fire should be used in rebuilding, or should go to the remaindermen, reserving the interest for life for the life tenant." In our former decision in this case we held in these words: "Evidently the judgment of the Supreme Court is bottomed upon the idea that the life tenant is an implied or *quasi* trustee for the remaindermen. Once you admit this trust relation between the life tenant and

14—56

the remaindermen, then the conclusion is inevitable that the life tenant cannot protect her own interest and disregard those of her *quasi cestuis que trustent."* The respondent, Miss Lucy J. Green, realized the force of this decision; hence, when the action came before the master, she offered to allow judgment for the $3,000 insurance money to go against her—in the words we have already hereinbefore quoted. The Circuit Judge has held that this judgment for $3,000 is all that should be pronounced against Miss Lucy J. Green. Whether this conclusion of the Circuit Judge is tenable, we now propose to see. If he is correct, then the case is ended with that judgment; but if it is not correct, the results may be far-reaching as to this defendant, Miss Lucy J. Green. In our former decision we held that as to this fund Miss Lucy J. Green held the position of an "implied or *quasi trustee."* We must be governed by this holding, no matter what may be the consequences. Is there any difference, in law and in equity, between express and implied trustees? To narrow the inquiry so that it may be kept within reasonable bounds in this discussion, we may ask is there any difference admitted to exist in the dealings of a trustee of an express trust with the funds belonging to that trust, as compared with the dealings of an implied or *quasi* trustee with the funds of his trust? Mr. Story in his work on Equity Jurisprudence (2 vol., section 980), says: "Express trusts are those which are created by the direct and positive acts of the parties by some writing, order, or will * * * Implied trusts are those which are deducible from the nature of the transaction, as a matter of clear intention, although not found in the words of the parties; or which are superinduced upon the transaction by operation of law, as matter of equity, independent of the particular intention of the parties." The distinction thus pointed out in the very definition of the two kinds of trusts, almost of necessity leads us to expect a strictness in the enforcement of the law governing the first class which does not and ought not to obtain in the latter; for express trusts in their

creation are the intentional work of parties, and set forth in writing; while, on the contrary, in the case of implied trusts, the parties to the same are often not conscious that their dealings in relation to a subject matter have anything of a trust character about them. We will pursue the consideration of implied trusts, and in doing so we observe that such trusts are said to be either resulting or constructive trusts. Of resulting trusts, this Court has cited with approval, in the case of *Rogers* v. *Rogers,* 52 S. C., 392, the classification of Mr. Perry in his work on Trusts (3d edition), 138, into five divisions: "(1) When the purchaser of an estate pays the purchase money and takes the title in the name of a third person. (2) Where a person standing in a fiduciary relation uses fiduciary funds to purchase property and takes the title in his own name. (3) When an estate is conveyed upon trusts which fail, or are not declared, or are illegal. (4) When the legal title to property is conveyed, and there is no reason to infer that it was the intention to convey the beneficial interest. (5) When voluntary conveyances are made, or conveyances without consideration."

Applying the facts as developed by the testimony in the case at bar, within the limits of the findings of fact by the master, we find that the use of the $3,000 of insurance money was applied, if at all, in the purchase in part of the brick yard place; that the price of said brick yard place was the $2,500 paid to the sheriff of Richland County under the sale of said lands in foreclosure proceedings at the suit of Henneman and another, and the $176.66 paid by the defendant, Miss Green, for taxes. That these sums, $2,500 and $176.66, had no connection with the $3,000, the insurance money. But it is insisted, as predicated upon the finding of the fact by the master, that the defendant, Miss Green, had, previous to this sale of the brick yard tract of land by the sheriff, applied $2,200 of the insurance money in her hands, in trust by implication, to the partial payment of the two mortgages which were the first liens upon those lands, and, therefore, in the first place,

though not apparently used in the purchase of the brick yard lands, yet in reality it was part of such purchase money; and, in the second place, that if not an actual payment of the technical purchase money of said lands by Miss Green, yet as she had invested $2,200 of the money she held in trust in the purchase of a part of the mortgage debts of Henneman and another (which holding she had made junior in right to Henneman and the other mortgage), and inasmuch as she placed $2,676 of her own money in this purchase, in equity the $2,200 of trust money should be esteemed a part of the purchase money. We are inclined to hold that the plaintiffs have a right in equity to consider that $2,200 of the trust funds were invested in the brick yard place, and that having been so invested, the transaction falls under the *second* division of resulting trusts, in the classification of Mr. Perry, previously referred to. But the serious question comes now. Here this implied trustee has invested $2,600 of her own funds along with $2,200 trust funds in the purchase of the brick yard tract of land—will such an intermixture of funds by the trustee enable these plaintiffs to claim the whole of the 417 acres of land? We doubt, if it were *an express trust,* that the *cestuis que trustent* could make good a claim to the whole trust, under the facts of this case. We feel sure that in this case of an implied trust, that the *cestui que trustent* could at the very best only claim 22-48 (in round numbers) of this tract of land, while Miss Green would hold the remaining 26-48 in her own right. But are the plaintiffs entitled to anything more than to hold the proceeds of the sale of the "brick yard place" as a security for the forthcoming of the $3,000 trust funds?

We are inclined to the view that the plaintiffs must be limited to holding the proceeds arising from the sale of the brick yard place—say the $30,000 now due and secured by bond and mortgage—as a security for the $30,000 of insurance money. It is in this way equity admeasures the rights of the parties growing out of a transaction wherein no evil intentions existed in any of them. There is no suggestion of

insolvency of Miss Green. The only complaint or fault against Miss Green alleged was that she was too generously inclined in the way of gifts of property to those of her own flesh and blood, who, no doubt, the results of the war between the States had left not as wealthy as we could all wish they were. In reaching our conclusion that there was a resulting trust here, we have been guided by our cases— *Mathews* v. *Heyward*, 2 S. C., 245; *Ex parte Trenholm*, 19 S. C., 135; *Jones* v. *Hughey*, 46 S. C., 193; *Gaines* v. *Drakeford*, 51 S. C., 38; *Rogers* v. *Rogers*, 52 S. C., 391; *McGee* v. *Wells*, 52 S. C., 479. And in reaching the conclusion that the proceeds arising from the sale of the brick yard place should only be considered as a security for the $3,000, we have depended upon our own convictions, under the proofs, of what was just and equitable between these parties litigant; and our views have been re-enforced by the following cases and authorities: *Mathews* v. *Heyward*, 2 S. C., 245, where this Court quoted with approval this language from Lewin on Trusts and Trustees, 762: "When a trust fund is traced into land, and the fund constituted a part only of the money laid out in the purchase, the Court has usually given a lien merely on the land for the trust money and interest * * *" *Myers* v. *Myers*, 2 McC. Chan., 264, where the Court puts the view in these words: "A person may sometimes, by mixing trust funds with his own, subject himself to the loss of both, for it is his own fault if they have not been kept separate; but it does not appear to me that this is a case which will subject the defendant to the loss of all the property he has in possession, merely because he cannot show what part of it has been purchased with the proceeds of the trust estate." Adams Equity, page 143, where that author says: "In like manner, if an estate or fund has been changed by breach of trust, the *cestui que trust* may, at his option, waive its restoration, and may attack and follow it in its altered form—*e. g.*, if a trustee or executor purchase an estate with his trust money or assets, and the fact of his having done so be admitted or distinctly proved, the parties

interested in the money may claim the estate; *or if the purchase be made partly out of the trust fund and partly out of the trustee's own property, they may claim a lien for the amount misapplied"* (italics ours). But why multiply words, when of necessity such should be the result in equity? We accordingly sustain the 4th exception.

We accordingly overrule the fifth exception.

We sustain the sixth exception. The Circuit Judge having reached the conclusion that plaintiffs were entitled to have $3,000 secured under the offer of Miss Green, and to allow judgment therefor against her, ought to have so decreed, and not to have dismissed the complaint. Infants are before the Court.

We have by the views we have taken held Miss Green liable for the $3,000 as a trust fund, and it is unnecessary to lay any stress upon the slight investment of trust funds in the Bull street lands and houses, as the bond and mortgage for $30,000 is abundant security to plaintiffs for the $3,000 insurance money. Accordingly, we overrule this exception.

We overrule the 8th exception. We view the lien of plaintiffs as only securing the $3,000 insurance money, and the same cannot increase except after Miss Green's death, and that by interest which may thereafter be due.

Our views necessarily overrule the 10th exception.

We have held in effect as pointed out in the 11th exception.

We have refused to hold as pointed out for us in the 12th exception, and also the 13th exception.

We could not visit upon the implied trustee the serious punishment indicated in the 14th exception. Her conduct was technically a violation of an implied trust, but innocent in intention and holy in its purpose. Would that many other brothers or sisters may be found in our Commonwealth who would do as much as did Miss Green in soothing the last moments of an unfortunate and proud-spirited brother.

It is the judgment of this Court, that the decree of the Cir-

cuit Judge be modified as herein indicated, and that the action be remanded to the Circuit Court to pass the appropriate orders to preserve the $3,000 insurance money according to the offer of Miss Lucy J. Green, both as to the fund itself and the costs.

MR. JUSTICE JONES *concurs in result.*

MR. JUSTICE GARY, *concurring.*    There are no allegations in the complaint charging Miss Lucy J. Green with fraud. Indeed, it seems to be conceded on all sides that none was intended by her.    This question will, therefore, not enter into the consideration of the case.

The order of reference directed the master, "to take the testimony upon all the issues in the cause and report the same, together with any findings of fact thereon, to this Court."    One of the issues in the cause was whether the land known as the "brick yard" tract was purchased with money derived from the policy of insurance.    The master in his report finds specifically as matter of fact that the said tract of land was not purchased with trust funds, but with the individual money of Miss Lucy J. Green.    There were no exceptions to the master's report.    Moreover, this finding of fact was concurred in by the Circuit Judge.    As there were no exceptions filed to the master's report, his findings of fact are conclusive upon this Court.    *Verner* v. *Perry,* 45 S. C., 262.    This, in my opinion, eliminates from our consideration the issue as to the "brick yard" tract of land.

Another issue in the cause was whether the lot at the corner of Bull and Pendleton streets was purchased with the funds belonging to the trust estate.    The master's report shows the details connected with the purchase of said lot. It was sold for $590.    On the same day the personal property was sold for $291.80, and was purchased by Miss Lucy J. Green to the extent of $182.50.    Miss Lucy J. Green paid $482.64 of the purchase money out of her own funds.    The

master in his report says: "Of the proceeds of this sale, I find that Miss Green received $289.86 on account of her loan to Allen J. Green, committee, same being credit on judgment of Scott, assigned to her as collateral security to the said note of Allen J. Green, committee." Conceding the general principles of law to be that a life tenant is a constructive trustee for the remaindermen, and that when the life tenant invests the trust funds in her individual name in the purchase of property, the remaindermen may elect whether to hold the life tenant accountable for the trust funds, or have a trust declared in the property so purchased, still it must be admitted that the facts of a particular case may be such that the application of these principles would work injustice to the life tenant, in which case equity would withhold its aid. The question, then, is whether the facts of this case show that it would be unjust to allow the remaindermen to elect either to proceed against the life tenant or to subject the said lot to the operation of the trust. Miss Green labored under a mistake in supposing that the fund derived from the policy of insurance belonged to her individually, and when she purchased the said lot it was not her intention to purchase for the benefit of the remaindermen, but on her own account. Even if it was a technical violation of her duty as life tenant to invest any portion of the insurance money in the purchase of property in her own name, it was not due to any want of care or act of intentional wrong on her part. These circumstances convince me that the Court of Equity should not exercise its powers, and that the judgment of the Circuit Court should be affirmed, especially since there is no question but that the remaindermen will get every cent of the original funds. I, therefore, to this extent, concur in the opinion of Mr. Justice Pope.

Mr. Justice McIver, *dissenting*. Being unable to concur in the conclusion reached by Mr. Justice Pope, upon the main question involved in this case, I propose to state my own views. As I understand it, it is, and must be, conceded that

the defendant, Lucy J. Green, held the sum of $3,000, received by her as the amount of the insurance on the dwelling house, in trust for herself for life, and for the remaindermen mentioned in the first clause of her mother's will. This was expressly decided under the former appeal in this case, and is, therefore, undoubtedly, the law in this case, at least, and must be, and, as I understand it, is fully recognized by all parties concerned. I may add, that I think it is the law of the land, applicable to every case which may be presented under similar circumstances.

The next inquiry is, what is the nature of this trust? Mr. Justice Pope, in his opinion, seems to regard the trust as a resulting trust, and though he does say: "the transaction falls under the *second* division of resulting trusts in the classification of Mr. Perry, previously referred to," yet the cases which he cites, in a subsequent part of his opinion, to vindicate his conclusion that this was a resulting trust, are all cases (except the case of *Mathews* v. *Heyward*, 2 S. C., 245, which will be presently more particularly noticed), in which the trust sought to be set up could only fall under the first division of Mr. Perry's classification. It seems to me, however, this is not a case of a resulting, but of a constructive trust. As is said in 2 Pom. Eq. Jurisprudence, sec. 1030: "The second main division of trusts * * * embraces those which arise by operation of law, from the deeds, wills, contracts, acts or conduct of parties, *either with or without their intention* (italics mine), but without any express words of creation;" and in a note to that section, the distinguished author says: "The most natural and simple name by which to designate the entire class of trusts arising by operation of law, would be 'implied trusts,' as distinguished from 'express trusts,' created by words intentionally used." In the same section, he says: "This entire grand division consists of two general classes: resulting trusts and constructive trusts. The line of distinction between these two classes is clear and definite; the failure to observe it has produced much unnecessary confu-

sion." The learned author then proceeds, in sec. 1031 *et seq.,* to define and describe resulting trusts; and in sec. 1044, he says: "Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, *where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the* one holding the legal title, and where there is no expressed or implied, written or verbal declaration of the trust" (italics mine). And after giving various instances in which a constructive trust arises, the author, in sec. 1049, says: "Another important form of the trust arises from the acts of persons already possessing some fiduciary character, or standing in some fiduciary relation. Whenever a trustee, or other person in a fiduciary capacity, acting apparently within the scope of his powers—that is, having authority to do what he does—purchases property with trust funds, and takes the title thereto in his own name, without any declaration of trust, a trust arises with respect to such property in favor of the *cestui que trust* or other beneficiary. Equity regards such a purchase as made in trust for the person beneficially interested, independently of any imputation of fraud, and without requiring any proof of an intention to violate the existing fiduciary obligation; because it assumes that the purchaser intended to act in pursuance of his fiduciary duty, and not in violation of it. This doctrine is of wide application; it extends to trustees, executors and administrators, directors of corporations, guardians, committees of lunatics, agents using money of their principals, partners using partnership funds, husbands purchasing property with money belonging to the separate estate of their wives, parents and children, and all persons who stand in fiduciary relations towards others. Equity jurisprudence contains few more efficient doctrines than this in maintaining the beneficial rights of property." If this be the rule, even where the trustee had authority to make the purchase *a fortiori,* it applies to a case where the purchase is made without author-

ity; and it is so laid down in sec. 1051, Pom. Eq.   I desire
to add just here, that I have felt at liberty to say that, in my
judgment, this is a case of a constructive and not a resulting
trust, because I do not understand that this Court, in the
case of *Rogers* v. *Rogers,* 52 S. C., at page 392, ap-
proved the classification of resulting trusts adopted
by Perry in his work on Trusts, as is stated in the
leading opinion; for, Mr. Justice Jones, in delivering the
opinion of the Court, stated the classifications of resulting
trusts, as made by Pomeroy and concurred in by Adams in
his work on Equity, by Perry, and as found in the Am. &
Eng. Ency. of Law, without expressing a preference for
either one of the classifications, and then proceeded to show
that the testimony in that case did not bring it "under any
of the classifications above."   It may be as well also to correct
two manifest clerical errors or misprints in the opinion in
that case.   The citation from Pomeroy Eq. Jur. should be
sec. 1031, instead of 103, as the last named section makes
no reference whatever to resulting trusts; and the word
"third," in the eighth line from the top of page 393, should
be "second."   But whether the trust in this case should be
properly designated as a constructive or as a resulting trust,
is a matter of no real practical importance in this discussion;
for even if it should be properly regarded as a resulting trust,
it must necessarily fall into the second class mentioned by
Mr. Perry, to wit: "Where a person, standing in fiduciary
relation, uses fiduciary funds to purchase property and takes
the title in his own name," which is, substantially, the same
as one of the instances in which a constructive trust arises
as described by Mr. Pomeroy in sec. 1049, above quoted.
If, then, the life tenant, Miss Lucy Green, stood "in a fidu-
ciary relation" towards the remaindermen, and if the insur-
ance money—$3,000—was a fiduciary fund in her hands, as
has been heretofore determined by this Court under the
former appeal; and if the whole, or any part of that trust
fund, has been used by her in acquiring the property men-
tioned in the complaint, then, under the authority above

cited, it follows, necessarily, that such property, so soon as it was acquired by the life tenant, became impressed with the trust above described, either in whole or in part, as the case may be, and the Court should so declare.

The next inquiry, in natural order, would be whether the whole or only a part of the trust fund was used in acquiring the property in question; but this being a question of fact, need not be pursued in detail in a mere dissenting opinion. I do not, therefore, deem it necessary to say more on this point, than that the undisputed facts as found by the master, are, in my judgment, quite sufficient to show that the property above described in the complaint, and upon which the plaintiffs ask that the trust thereby impressed upon it may be declared, was in reality acquired solely by the use of the original trust fund; for although the Stanley note was at first paid by Miss Green out of her own funds, and the real estate at the corner of Bull and Pendleton streets were originally paid for, in part, by Miss Green out of her own funds, yet these payments were reimbursed to her out of the proceeds of the sale of the brick yard tract, upon which, according to my view, a trust was impressed by the facts set forth in the pleadings and the testimony. But if I am in error in concluding that the whole of the property in question was acquired by the use of the trust fund, and that, in fact, a portion of said property was acquired by Miss Green by the use of her own funds, it becomes necessary to inquire what is the effect of that. In such a case, has the *cestui que trust* the right to follow the trust fund into the property which the trustee has acquired, partly by the use of the trust fund, and partly by the use of the trustee's own funds, and have a trust declared upon the property, or rather upon such a proportion of the property as is represented by the amount of the trust fund used in its purchase, leaving the remaining portion of the property in the hands of the trustee unaffected by any trust; or is the *cestui que trust* only entitled to a lien on the property to secure the trust fund? As I understand it, Mr. Justice Pope, after conced-

ing that the trust fund, at least to the extent of $2,200, was invested in the brick yard tract, holds that the remainder-men are not entitled to have a trust declared upon a proportionate part of the said tract, but are only entitled to a lien on so much of the proceeds of the sale of that tract as are now in the hands of Miss Green, to wit: the bond and mortgage for $30,000, for the forthcoming of the trust fund ($3,000), at the termination of the life estate. It seems to me that there are insuperable objections to such a conclusion. In the first place, the well settled and salutary rule of equity is that when a trustee purchases or otherwise acquires property by the use of trust funds, such *property* becomes at once impressed with a trust, at least to the extent to which the trust fund has been used in its acquisition; and such property does not stand as a mere security for the trust fund—*2* Pom. Eq. Jur., sections 1049 and 1051. For in such a case: "Equity regards the *cestui que trust,* although without any legal title, and perhaps without any written evidence of interest, as the real owner, and entitled to all the rights and consequences of such ownership." Sec. 1058. It, would, therefore, be altogether anomalous (not to use any stronger term) for a Court of Equity, which regards the *cestui que trust* as the real owner of the property, to hold that the *cestui que trust* has a lien on his own property. Such conclusion would also be in direct conflict with that broad principle of equity, which is universally acknowledged, "that a trustee, or person clothed with a fiduciary character, shall not be permitted to use his position or functions so as to obtain for himself any advantage or profit inconsistent with his supreme duty to his beneficiary," which principle, Mr. Pomeroy says, in sec. 1050, extends "to all actual and quasi trustees." It is very obvious that this wise rule of equity has the most salutary efficacy in protecting trustees from the temptation to speculate with trust funds, and thereby preventing any loss or diminution of such funds; and hence the rule should never be overlooked or disregarded. Here, however, I desire to disavow, in the most emphatic terms, any intention or disposi-

tion to impute to the trustee, Miss Green, any wrong or improper motive or intention whatsoever. Besides her high character, which, of itself, would be sufficient to negative any such imputation, it is perfectly manifest that until she was otherwise informed by the decision of this Court, under the former appeal, she honestly believed that the insurance money was absolutely her own, unaffected with any trust, and hence that she had the perfect right to dispose of it as she saw fit. It is, and must be, conceded by every one that her intentions were not only innocent, but of the most commendable character. But, as has been shown in the authorities above cited, the question of intention plays no part in considering a trust of this kind, and the Court is bound to determine this case just as it would any other, upon the well established principles of equity. And here I may add, that I am unable to perceive any hardship or injustice to which Miss Green would be subjected under the view which I have adopted. For she would still be entitled to hold and enjoy all the property upon which I think a trust should be declared, in precisely the same manner and to the same extent as she was entitled to hold and enjoy the property originally devised to her by her mother's will; and it seems that she has been for several years in the receipt of quite a handsome income from such property, and this she will be entitled to enjoy as long as she lives. The principles above laid down do not rest alone upon the authority of Mr. Pomeroy, but are also fully supported by other authorities, as I will proceed to show. Thus, in 2 Story Eq. Jur., sec. 1210, as another illustration of the doctrine of implied trusts, it is said: "If a trustee, authorized to purchase lands for his *cestui que trust* or beneficiaries, should purchase lands with the trust money, and take the conveyance in his own name, without any declaration of trust, a Court of Equity would, in such a case, deem *the property* to be held as a resulting trust, for the persons beneficially entitled thereto. * * * In every such case, however, it must be clear, that the land has been paid for out of the trust money; and if this appears, a trust will

be implied, not only when the party may be presumed to act
in execution of the trust, but even when the investment is in
violation of the trust.   For, in every such case, where the
trust money can be distinctly traced, a Court of Equity will
fasten a trust upon the land in favor of the persons bene-
ficially entitled to the money."   And in sec. 1211 of the same
volume, it is said: "If a trustee should misapply the funds of
the *cestui que trust,* the latter would have an election either
to take the security *or other property* in which the funds
were wrongfully invested, or to demand repayment from
the trustee of the original funds."   Now, in this case, it is
conceded that the application of the original trust fund to the
purchase of *junior liens* upon property was a misapplication
of such funds; and the plaintiffs, by this action, have elected
to pursue *the property* in which the trust fund was wrong-
fully invested, rather than to demand of the trustee repay-
ment of the original trust fund.   See, also, sec. 1258.   So,
also, in sec. 1260, it is said, that where a trustee, in violation
of his duty, should acquire land by the use of a trust fund,
and take a conveyance in his own name, the *cestui que trust*
would be without remedy *at law.*   "But a Court of Equity
would hold the *cestui que trust* to be the equitable owner of
*the land,* and would decree it to him accordingly."   And in
sec. 1261, it is said: "Nor is the doctrine confined to trus-
tees, strictly so called.   It extends to all other persons stand-
ing in a fiduciary relation to the party, whatever that rela-
tion may be."   See, also, sec. 1262, where it is said: "In
cases of this sort, the *cestui que trust* (the beneficiary) is not
at all bound by the act of the other party.   He has, there-
fore, an option to insist upon taking *the property;* or he may
disclaim any title thereto, and proceed upon any other reme-
dies to which he is entitled, either *in rem* or *in personam.*"
In all these quotations from Story's Equity, the italics are
mine.

I propose next to show that these fundamental principles
of equity jurisprudence, laid down by two standard text-
writers, have been recognized in the decided cases, and have

not been repudiated, nor even disapproved in a single case, so far as I am informed, where such principles have been invoked for the protection of the rights of a *cestui que trust.* In the case of *Oliver* v. *Piatt,* 3 How., 333, the Supreme Court of the United States distinctly recognized and followed the principles above laid down by the text-writers. So in the case of *McNeil* v. *Morrow,* Rich. Eq., Cases, 172, the same principles were distinctly recognized. The facts of that case may be concisely stated as follows: James R. Morrow, one of the defendants, being the guardian of his brother John, held a judgment against Tabitha Morrow as part of the assets of his ward's estate. Tabitha, being unable to pay her debts, conveyed five slaves to the said James R., upon condition that he should pay her debts. Thereupon the said James R. entered satisfaction on the judgment. James R. Morrow having become insolvent and not having paid any of the debts of Tabitha, his letters of guardianship were revoked, and the plaintiff, McNeill, was appointed guardian of John, in his place, and he filed the bill to restrain the creditors of James R. from selling the said slaves, and to subject them to the payment of the judgment against Tabitha in favor of plaintiff's ward. The bill was sustained, and the slaves were ordered to be sold and the proceeds applied to the payment of the amount due on the judgment. Judge O'Neal, in delivering the opinion of the Court, after saying that James R. received the slaves impressed with a trust, and that when he entered satisfaction on the judgment, it operated, in law, as an acknowledgment of the receipt of the amount due on the judgment, uses this language: "In what he received it, whether in money or property, is a question which his ward might investigate or not, if he chose. He might have elected to consider it as money, and have charged his guardian accordingly. But if it was more advantageous to the ward to follow the specific property received, it is, I think, demonstrable that he had a right so to do." And after citing several decisions of Chancellor Kent, whom he characterizes as "The most eminent Chancery

Judge of modern times," he says that the rules laid down in those cases conclusively show "that it is a clear principle of equity that a trustee cannot make any advantage to himself by the application of the trust fund to his private purposes." Again, the learned Judge uses the following language: "So long as the fund or property received for the *cestui que trust* can be traced, it must enure to his benefit. Here the property was received by his guardian, in payment of the debt due to his ward, and although he, no doubt, did not intend the property to be his ward's, yet he cannot, by the use of his ward's funds, make any advantage to himself, and as the very thing received in payment is now within the power of the Court, it must be followed *as belonging to the ward* (italics mine). If the defendant, James R. Morrow, acquired a title to the slaves by the entry of satisfaction on his ward's judgment, it was, in effect, purchasing them with the funds of his ward, and a trust results for his *cestui que trust*." Again, in the same case, it was said: "If the complaint had sought a recovery of the whole of the slaves as a resulting trust, from the purchase being made with his ward's funds, he might have succeeded even to this extent, upon showing that Mrs. Morrow owed no other debt. But as he has not made this claim, and has only sought to make the property liable to the payment of the debt due by Mrs. Morrow to his ward, and as it has not appeared that Mrs. Morrow did not owe other debts, the slaves will only be declared liable to the payment of that debt." This, it is claimed, is a mere *dictum,* and, therefore, not authoritative. This is true in one sense, but the doctrine there laid down necessarily follows from the principles previously laid down, upon which the whole case turned, and was not applied in that case, simply because the complainant did not ask that it should be applied. The Court, therefore, after laying down the law applicable to the case where property has been acquired by the use of trust funds, recognized the right of the *cestui que trust* to elect whether he would claim that the property thus acquired became impressed with the trust which rested upon the trust

15—56

fund in its original form, or claim that the property should
be subjected to the repayment of the original trust fund; and
the *cestui que trust* having, by his guardian, elected to make
the latter claim, it was allowed.    The next case which I cite
is *Haynsworth* v. *Bischoff*, 6 S. C., 159, which, as it seems
to me, is, in principle, practically identical with the case un-
der consideration.    The facts of that case may be stated
briefly as follows: J. M. McCall, as administrator of an es-
tate, had in his hands as administrator money belonging to
his intestate's estate, which he loaned to one W. E. McCall,
taking his notes therefor, payable to himself individually
and not as administrator.    Afterwards, J. M. McCall sued
these notes, recovered judgment, and under the execution
issued to enforce said judgment, the land in question was
sold by the sheriff, and bid off by J. M. McCall, who took
title in his own name.    The amount of his bid was more
than sufficient to satisfy his own judgment, and he paid the
balance of his bid, after satisfying his judgment, by giving
his note to the holder of another judgment against the judg-
ment debtor, W. E. McCall, secured by a mortgage of the
land in question.    Some time after this, J. M. McCall con-
tracted a debt to Bischoff, for which he gave his note, and
several months thereafter he executed a mortgage on the
land to Bischoff to secure the payment of said note.    Subse-
quent to the execution of the mortgage, Bischoff commenced
an action on said note against J. M. McCall, and having re-
covered judgment thereon, issued execution under which the
land was levied on by the sheriff and advertised for sale.
Thereupon the plaintiffs, who were beneficially entitled to
the assets of the estate of which J. M. McCall was the admin-
istrator, commenced this action for injunction to restrain
the sale, claiming that the land in question had become, by
substitution, assets of the estate in which they were inter-
ested, and their claim was sustained.    Mr. Justice Willard,
in delivering the opinion of the Court, speaking of the judg-
ment recovered by J. M. McCall against W. E. McCall,
under which J. M. McCall bought the land and took title in

his own name, uses this language: "The judgment was in itself an asset, and enured to the benefit of the estate; J. M. McCall having become the purchaser of the lands and taken title in his own name, to the extent that the consideration of such purchase was the money due on the judgment, he became in equity a trustee for the use of the estate. It was, in substance, the ordinary case of a trustee purchasing lands with trust funds, and taking title in his own name, whence arises in equity a trust for those entitled beneficially to the trust funds"—citing *McNeil* v. *Morrow, supra.* Three things are to be noticed about that case: 1st. That the principles upon which my conclusion is based were recognized and enforced even against an innocent purchaser who had no notice of the trust, because he could not claim the position of a purchaser for valuable consideration without notice, as his mortgage was given to secure an *antecedent* debt, and there was no evidence that it was based upon an agreement to forbear enforcing payment of said debt. 2d. That the trust followed the original fund upon which it was impressed, through all its subsequent mutations until it finally rested upon the land. 3d. That though the trust fund did not constitute the *entire* consideration for the purchase of the land, yet there was no intimation or even hint that such a circumstance would have the effect of limiting the right of the *cestui que trust* to a mere lien on the land to secure the repayment of so much of the trust fund as was used in its purchase; but, on the contrary, it was distinctly held that *the land itself* became impressed with the trust to the extent that the trust fund constituted a part of the consideration. For example, as I understand it, if the trust fund constituted one-half of the consideration, then the *cestui que trust* has a right to claim that one-half, in value, of the land impressed with the same trust as that resting upon the original trust fund. Otherwise, the trustee would be allowed to make a profit to himself, by the use of the trust fund, to the extent that one-half of the land, or its proceeds, if sold, would exceed the amount of the original

trust fund, in flagrant violation of the well settled and uni-
versally accepted doctrine that a trustee will never be al-
lowed to make a profit to himself by the use of the trust fund.
So in *Covar* v. *Cantelou*, 25 S. C., 35, when a testator gave a
portion of his residuary estate to his executor in trust for the
sole and separate use of Mrs. Tillman, a married woman,
during her life, and after her death to be equally divided
among her children, which fund was afterwards invested in
a tract of land under an order of the Court, and subsequently
a portion of said land, upon the petition of the life tenant
and her trustee, to which the remaindermen, though then
*in esse,* were not parties, was sold under the order of the
Court, it was held that the rights of the remaindermen to
the land so sold were not divested.   In the opinion of the
Court I find the following language: "There can be no doubt
that the plaintiffs, as children of Mrs. Tillman, were, upon
her death, entitled as remaindermen under the will of John
Ryan to the share given to her, or for her use, during her
life; and when that share, or a portion of it, was invested
in the land in question, they thereby acquired an interest in the
land which could not be divested by a proceeding to which
they were not parties.  It is urged, however, that the original
fund to which the plaintiffs were entitled in remainder, was
not the land now in controversy, but was personal property,
which was invested in this land by the order of the Court in
a proceeding to which they were not parties; and, hence, that
they have no claim upon the land, but only upon the fund
invested.    Whether they were necessary parties to the pro-
ceeding under which the investment was made, need not now
be considered.    For even conceding that they were (though
we are not to be understood as intimating any opinion upon
that question), and that, not being parties, they were not
bound by the investment, yet that cannot affect the present
inquiry.   If their funds were invested in land without
authority, they had the election either to disavow the invest-
ment and pursue the fund, or to sanction the investment and
claim the property in which the fund was invested; and they

have elected the latter alternative by bringing these actions."
See, also, the case of *Brazel* v. *Fair*, 26 S. C., 370, which
fully recognizes and applies the foregoing principles, and is
especially important as showing what will be the effect of a
trustee mixing the trust funds with his own in making an in-
vestment; for Mr. Justice McGowan, in delivering the opin-
ion of the Court, quotes, with approval, from the case of
*Knatchbull* v. *Hallett,* 13 Ch. Div., 696, the following lan-
guage: "In that case, according to the now well established
doctrine of equity, the beneficial owner has the right to elect
either to take the property or to hold it as security for the
amount of the trust money laid out in the purchase; or, as we
generally express it, he is entitled to his election, either to
take the property or to have a charge on the property for the
amount of the trust money." It is contended, however, that
the three cases cited were all cases of express trusts, and,
therefore, not applicable to this case. But the authorities
above cited, especially from Pom. Eq. Jur., show that the prin-
ciples upon which I rely apply as well to *quasi* or im-
plied trustees as to express trustees; and it is difficult
to conceive why there should be any difference *in this
respect* between express and implied trustees; for these prin-
ciples grow out of the essential nature of the trust relation;
and it cannot make any difference, whether such relation is
created by the express act of the parties or arises by opera-
tion of law. So soon as the trust relation arises, no matter
how, these principles become at once applicable, because they
do not grow out of the manner in which the trust is created,
but out of the nature of the trust relation which is created.

I will next proceed to notice such of the cases cited by
counsel for respondents, as it seems to me require attention.
The case of *Myers* v. *Myers,* 2 McC. Ch., 214, so far from
being in conflict with the principles upon which I rest my
conclusion, expressly recognizes those principles, as may be
seen by reference to page 265. The case, however,
seems to have been cited for the purpose of showing
that the fact that the trustee has mixed the trust

funds with his own in acquiring property, is not sufficient to
warrant the Court in impressing a trust upon the whole of
the property.    At that page I find the following language,
which is quoted in the argument of counsel for respondents:
"A person may sometimes, by mixing the estate of another
with his own, subject himself to the loss of both; for it is his
own fault that they have not been kept separate.    But it does
not appear to me that this is a case which will subject the
defendant to the loss of all the property he has in possession,
merely because he cannot show what part of it has been pur-
chased with the proceeds of the trust estate."    Inasmuch
as the conclusion which I have reached does not rest upon
the ground that the trustee, Miss Green, by mixing the trust
funds with her own, has thereby subjected herself to the loss
of her entire property, but I only contend that so much of
the property, whatever may be now its form, which was ac-
quired by the use of the trust fund, shall be declared to be
impressed with the trust which rested upon the trust fund in
its original form; it is very clear that the case of Myers does
not conflict with my views, but, on the contrary, rather sup-
ports them.    The case of *Wallace* v. *McCollough,* 1 Rich.
Eq., 426, is relied upon by counsel for respondents to show
that the plaintiffs here are only entitled to a lien on the prop-
erty acquired by the trustee through the use of the original
trust fund to secure the repayment of the amount of said
fund.    But that case differs materially from the case under
consideration.    In that case, Robert McCollough (the de-
fendant in the case) and Elizabeth Wallace (one of the
plaintiffs), in contemplation of marriage, executed a deed of
marriage settlement, whereby the property of Elizabeth, con-
sisting of lands, slaves and choses in action, was conveyed
to William Wallace, to be held by him in trust for the pur-
poses declared in said marriage settlement, to wit: "that the
said Robert should, after the said intended marriage, have,
receive and enjoy, during the joint lives of the said Robert
and Elizabeth, the interest and profit of the said lands, tene-
ments, personal property and other matters and things in

the said schedule set forth; that the same, and the profits, after the death of either of them, should be at the disposal of the said Elizabeth, notwithstanding her coverture." After the marriage was consummated, the property seems to have gone into the possession of the husband, rightfully, as the Court seemed to think, as by the terms of the settlement the husband was entitled to "have, receive and enjoy, during the joint lives of the said Robert and Elizabeth, the interest and profit" of the said property, and with the proceeds of some of the notes which he collected he bought certain slaves, one of which he sold and the others he threatened to remove from the State. Thereupon the bill was filed by the executor and executrix of William Wallace (the trustee), and Elizabeth, the wife, claiming that the slaves so purchased by the husband were subject to the trust declared in the marriage settlement, and praying that the husband "be required to give security for their forthcoming at the termination of his estate." Several grave and important questions, which in no way concern our present inquiry, were presented in that case, upon which the Court was much divided; and all that was said upon the point which it is supposed does concern the present case, is embraced in the following quotation from the opinion of the Court in that case: "Nor can the Court attach a trust upon the negroes received in lieu of the money, to any greater extent than to declare a lien on them *and the rest of the property,* until the defendant shall repay the money to the executors of the trustee, or secure the payment of the same, by instruments to be approved by the commissioner and by the Court, upon the same being reported. The defendant being entitled to the interest and profits of the fund, was entitled to borrow it from the trustee, upon proper security, and make the most profitable use of it within his power. Resolved into its elements, the transaction which took place was substantially this, *that the defendant borrowed the money from the trustee, and with it bought the negroes from Wallace and Parham, and is entitled to the benefit of his bargain.* His only obligation is to replace the

money; but until he does this, or secures it being done, the negroes purchased must represent the fund employed" (all the italics in this quotation are mine). From this language it is very obvious that the Court did not regard the husband as a trustee in any sense, but simply as a borrower of the money from the trustee, William Wallace, appointed by the deed of marriage settlement; that he was not a trustee but merely a debtor to the trustee, and his only obligation, therefore, was to return the money borrowed; and hence neither the trustee, Wallace, nor his executors, nor the parties beneficially interested, were entitled to anything more than a lien, not only on the slaves, but on *the rest of the property* of the defendant, to secure the payment of such *debt*. But in the case before the Court, Miss Green is, and has been declared to be, a trustee, and as such bound by all the obligations incident to that relation, and cannot, therefore, be treated as a mere debtor. It is obvious, therefore, that the case of *Wallace* v. *McCollough* has no application to the case now before the Court. The case of *Mathews* v. *Heyward*, 2 S. C., 239, which is cited by counsel for respondents and by Mr. Justice Pope, will next be considered. The facts of that case may be substantially stated as follows: On the 15th July, 1857, Thomas Savage Heyward bought from Richard F. Reynolds a house and lot as a family residence, and the same was conveyed to the said Heyward, as trustee under the will of Miss Harriet Ann Ashe. The purchase money of said premises was paid and secured in the following manner: T. S. Heyward having in his hands, as trustee as aforesaid, the sum of $4,629.10, which he held for the sole and separate use of his wife, and after her death for her children, applied a large portion thereof, to wit: the sum of $3,666.66, to the cash payment required by the terms of the purchase, and gave his bond, as trustee as aforesaid, secured by a mortgage of the premises, for the balance of the purchase money; and afterwards applied the balance of the trust fund towards the payment of the first instalment due upon said bond. Subsequently, this bond and mortgage were assigned by the said

Reynolds to the plaintiff, Mathews, who had notice of the facts above stated. Mrs. Georgianna Heyward died about a year after the purchase, and on the 29th of August, 1866, three of her children, who in the meantime had come of age, filed their bill in the Court of Equity, in which, after stating that the premises had been purchased with the trust funds as above mentioned, and family reasons rendering it beneficial that the same should be sold, go on to say that there was due on the purchase money about $2,500 secured by a mortgage given by the trustee, the holder of which was pressing for his money, they prayed that the property be sold, the mortgage debt paid, and the balance divided amongst the beneficiaries under the will of Miss Ashe. T. S. Heyward, the trustee, and the other children of Mrs. Georgianna, all of whom were minors, answered, the latter by guardian *ad litem.* On the 19th of February, 1867, Chancellor Lesesne made an order, by consent of counsel, directing a sale of the premises at such time and on such terms as might be designated in writing by a majority of the adult parties, provided the consent of the mortgage creditor be first had, and that from the proceeds the master should first pay the mortgage debt and the costs, and that from the balance he should pay the adults the shares to which they were respectively entitled, and hold the shares of the infants subject to the further order of the Court. No further proceedings, so far as appears, were taken in that case, which is designated as Heyward *v.* Heyward. But on the 17th of August, 1867, the plaintiff, Mathews, filed his bill to foreclose the mortgage which had been assigned to him. In that case (which is the case cited), the Court held that the proceeds of the sale of the mortgaged premises should be applied, first, to the payment of the shares of such of the children of Mrs. Georgianna Heyward as were minors at the time of the filing of the bill in the case of Heyward *v.* Heyward; next, to the payment of the mortgage debt—the adult children having estopped themselves by the allegations in their bill in the case of Heyward *v.* Heyward, from claiming any priority over the mortgage debt. From this state-

ment it is very clear that the case of Mathews *v.* Heyward has no application whatsoever to this case. The question which the Court is called upon now to decide was not, and could not, under the pleadings, have been raised in that case. The Court was not asked, in that case, to declare any trust impressed upon the property paid for, in part out of the trust fund. The only question there was whether the proceeds of the sale of the property, bought by the trustees and paid for, in part, out of the trust fund, and the balance secured by a mortgage of the premises, should be applied, first, to the mortgage debt, or to the repayment of the trust fund used in its purchase—a totally different question from that presented in the case now under consideration. I am, therefore, at a loss to perceive what bearing that case has on the present case.

Again, it seems to me that plaintiffs' third exception, which imputes error to the Circuit Judge in holding that the offer of Miss Green was in strict compliance with the decision of this Court under the former appeal, should be sustained, as it is based upon a misconception of that decision. The Court, as the case was then presented, was only called upon to determine whether the insurance money received by Miss Green was a trust fund, and that was all that was then decided or could have been decided. Whether any part or the whole of such trust fund had been used by Miss Green in acquiring the property which the plaintiffs claim is impressed with the trust, or whether the said property was acquired, in whole or in part only, by the use of the trust fund; and if so, what would be the effect, were questions which this Court could not, and did not, *then* undertake to decide. This third exception does not seem to have been specifically noticed by Mr. Justice Pope in his opinion; but under the view which I take of the case, it seems to me necessary that it should be noticed, for if this Court has already decided these questions, I would, of course, be bound by such decision.

I do not know that it is necessary, in a dissenting opinion,

to consider the additional grounds upon which this Court is asked to sustain the judgment appealed from, as they were not passed upon by the Circuit Judge, and were not considered or passed upon by Mr. Justice Pope in his opinion, for the reason that, under the conclusion he reached, he did not deem it necessary to do so. But as I have reached a different conclusion, it may, possibly, be necessary that I should consider them. I will, therefore, proceed to notice briefly these additional grounds. The first of these grounds is that the plaintiffs' action is barred by the statute of limitations. A complete answer to this position is that the statute could not commence to run in favor of the life tenant against the remaindermen until the falling in of the life estate, unless the life tenant does some act which imperils the rights of the remaindermen. This is for the obvious reason that the life tenant is legally entitled to the possession and use of the estate during her life, and may make any disposition of it that she pleases, except such as may be destructive of or prejudicial to the ultimate rights and interest of the remainderman. See *Clark* v. *Saxon,* 1 Hill Ch., 69; *McCreary* v. *Burns,* 17 S. C., 45, as well as many other cases cited in the argument of counsel for appellants. Now in this case it does not appear that Miss Green ever did any act which would give the remaindermen a right of action against her until the 16th of June, 1892, when she conveyed in fee simple part of the property covered by the trust to Halcot P. Green, as trustee for the Heywards; and that was within less than six years before the commencement of this action, to wit: on the 28th of May, 1896. Without going further into this question, it seems to be clear that the action is not barred by the statute of limitation.

The next additional ground is that the remaindermen are barred by their laches and by their acquiescence in the disposition which Miss Green has made of the trust fund. As to laches, it is difficult to understand how that can be imputed to the plaintiffs, when, as has been seen, the

plaintiffs never had any right of action until a comparatively short time, considerably less than the statutory period, before the commencement of this action. As to acquiescence, that is based upon the fact that the ancestors of the plaintiffs, then the remaindermen in existence, knew of and did not object to the use which the life tenant made of the trust fund; but how that can affect the claim

c    which the plaintiffs, who have succeeded to the rights of those remaindermen, now make, I am unable to conceive. It may be possible that, if the plaintiffs were now seeking to hold the life tenant responsible for making such use of the trust fund, the acquiescence of their ancestors in such use, might, by estoppel, defeat such a claim. For example, if the investment of the trust fund had proved very disastrous instead of very profitable, and the remaindermen were seeking to hold the absolute estate of the life tenant liable for such loss, such acquiescence on the part of their ancestors might possibly bar such a claim. But no such claim is now being made. But, on the contrary, the plaintiffs, by their action, distinctly sanction this use of the trust fund, and all that they ask is that the property acquired by such use of the trust fund shall be declared subject to the same trust that rested upon the original fund. It does not seem to me, therefore, that the plaintiffs are barred by the acquiescence of their ancestors in the use which the life tenant made of the trust fund from making the claim which they now make.

The third point made by the additional grounds is, that the disposition which Miss Green made of the insurance money should be regarded as a family arrangement. I am unable to find a particle of testimony to sustain any such view. There is no evidence whatever which even tends to show that such an idea ever entered the heads of any of the parties concerned. On the contrary, it is perfectly clear from the whole testimony that Miss Green honestly believed that she had the right to use the insurance money as her own absolute property; and so believing, she used it for the sole

purpose of protecting the property of her afflicted brother, so that he might have a comfortable support for the remainder of his life.   Since this most commendable purpose has been served, it turns out that Miss Green was mistaken in her belief that the insurance money was absolutely her own, but that it was a trust fund, the income of which she was entitled to for life, and at her death it would go to the remaindermen mentioned in her mother's will.   And all that the plaintiffs ask is that the property which has been acquired by the use of the trust fund (which no longer exists except in the form of such property) shall be declared subject to the same trust as rested upon the fund in its original form.   They do not seek to deprive Miss Green of any right which she was entitled to enjoy by the terms of her mother's will in the trust fund, either in its original form or in the form into which it has been converted by her; but, on the contrary, they fully recognize her right to the absolute enjoyment of the income of the property, largely increased, as it has been, for the whole term of her natural life.